## STATE vs. BENJAMIN F. VAN WINKLE.

1. CRIMINAL LAW—HOMICIDE CASES—CONFINEMENT OF JURY.

There being no statute requiring the confinement of a jury during a trial, the custom to do so will not be followed in homicide cases, where the charge is not for a capital crime.

2. HOMICIDE—EVIDENCE—DYING DECLARATIONS—OATH.

Though an oath attached to an alleged dying declaration could not be considered as a part thereof, the declaration, if otherwise admissible, would not be excluded because it was sworn to.

3. HOMICIDE—DYING DECLARATIONS—PRELIMINARY PROOF.

Where the state's preliminary proof has satisfied the judge that deceased was in contemplation or apprehension of impending death when he made an alleged dying declaration, no controverting testimony on the part of the defendant would be heard before the statement was admitted; but such controverting testimony would thereafter be received and submitted to the jury, as bearing on the weight to be given to the declaration.

4. HOMICIDE—EVIDENCE—DYING DECLARATIONS—FOUNDATION—FEAR OF DEATH.

A witness, who talked with deceased half or three-quarters of an hour before an alleged dying declaration was made, testified that deceased said he was "done for", was "going to die", and could "not recover"; but the only evidence indicating deceased's mind as to his condition at the time the statement was made was that of the magistrate, who testified that deceased asked the surgeon if he thought he would recover or get better, and that the surgeon "sidestepped the question". Held, that the proof that deceased made the declaration in the apprehension of impending death was insufficient to justify its admission.

(February 26, 1913.)

PENNEWILL, C. J., and WOOLLEY and RICE, J. J., sitting.

Josiah O. Wolcott, Attorney General, and John B. Hutton, Deputy Attorney General, for the state.

Charles H. Le Fevre, Levin Irving Handy and Richard R. Kenney for the prisoner.

Court of Oyer and Terminer, in and for Kent County, February Term, 1913.

Benjamin F. Van Winkle was indicted for murder in the second degree for the felonious killing of Aaron Reynolds, Jr., in the town of Smyrna on Wednesday, November 27, 1912. At the close of the testimony *nolle prosequi* entered.

At the trial, before the jury was sworn, the court made the following announcement relative to a change in the practice of confining juries in homicide cases, less than capital.

[1] PENNEWILL, C. J.:—It has been the custom or practice for a long period of years to keep the jury together in a homicide case from the time they are sworn until they are finally discharged by the court, no matter whether the charge was murder in the first degree, murder in the second degree or manslaughter. There has not, however, been any statute which required that the jury should be so confined. The custom is supported by the sanctity of age and the uniform practice of the court, but it is not based upon any requirement of the laws of this state. We are not inclined to depart from the custom in capital cases, but we think the great inconvenience and discomfort entailed upon jurors by the strict observance of this very old custom would justify the court in disregarding it hereafter in all other cases, provided the jury is instructed and strongly cautioned respecting their duties when not in the presence of the court. We are inclined to believe this ruling will be productive of more public good than could possibly result from the continued observance of the old rule. We are confident that juries will not be so likely to desire and endeavor to escape jury duty, and will be more able to properly perform such duty, if they are not subjected to the discomforts and hardships necessarily caused by the close and exacting confinement which the old rule required.

Testimony was adduced tending to prove that on Thursday evening, November 27, 1912, the prisoner and Aaron Reynolds, Jr., the deceased, had some words over window screens in the office of Van Winkle, who drove Reynolds from his office at the point of a revolver; that Reynolds told several persons he would get Van Winkle, would beat him to death; that towards midnigh Van Winkle left his office and started to his home, when Reynold

followed him in a threatening manner, and, in order to avoid trouble, Van Winkle went up an alley leading to his yard, Reynolds stopping at the mouth of the alley, stating, "I'll get you tomorrow"; that Van Winkle, finding his gate locked, returned to Commerce Street through the alley, and as he turned around the corner of the building was assaulted by Reynolds, by a violent blow with his fist upon the head; that Van Winkle picked up a piece of shingling lath, eight or ten feet long, lying on the street, and waved it in front of him to keep Reynolds away; that Reynolds ran into Van Winkle and struck him about the body, and as they went down upon the ground Van Winkle discharged his revolver five times, one of the bullets taking effect in the stomach of Reynolds, taking a downward course and striking the hip bone, penetrating the abdominal cavity and puncturing the intestines in five places, from the effects of which wound Reynolds died in the University of Pennsylvania Hospital in Philadelpha on November twenty-ninth following.

The state formally proved the execution of the following affidavit, which was signed by deceased, witnessed by two persons, with *jurat* annexed, etc.:

"University Hospital, Thirty-fourth and Spruce streets, Philadelphia, November 29, 1912, Aaron Reynolds, Jr., Smyrna, Delaware, thirty-two years of age, who being duly sworn according to law deposes and says that on Wednesday, November 27, 1912, about eleven-thirty P. M. and eleven forty-five P. M. I called at the office of Frank Van Winkle, we had some drinks, he got drunk, and run us out of his office on Market Street; he came on down town after us he carried a pole he struck at me with the pole, then I run into him then he shot me, then I fought him and took the revolver from him and gave it to the night watchman Jack Wick. We had no quarrel or anything before this."

And then offered the same in evidence as a dying declaration, which was objected to by counsel for the prisoner for the reasons stated in the opinion of the court sustaining the objection.

PENNEWILL, C. J.:—The state has offered in evidence, as a dying declaration, a statement made, signed and sworn to by the

deceased before a magistrate in a Philadelphia hospital shortly before his death.

The defendant opposes the admission of the statement on three grounds, viz.:

1.   Because the oath cannot be regarded as a part of a dying declaration, and if it does not make the entire paper inadmissible, the *jurat* should be detached before the statement is admitted.

2.   Because the defendant is prepared to show that the deceased, at the time of making the alleged dying declaration, was not under the apprehension of impending death, and the court should hear such testimony before admitting the statement in evidence.

3.   Because the state has not shown that the deceased, at the time he made the statement, was under the apprehension of impending death.

[2]   While the oath taken by the deceased could not in any event be considered a part of his dying declaration, the statement cannot be excluded for that reason. It has been held in this state in the case of *State v. Frazier*, 1 *Houst. Cr. Cas.* 176, that such a statement is admissible in evidence as a dying declaration not-withstanding the oath. In that case the court said, in charging the jury: "It is proper that we should further say to you in reference to these affidavits, containing statements offered as the dying declarations of Eliason, that they are before you as though they were not sworn to, and that the fact of their having been sworn to by him does not give them any additional force or weight whatever."

[3]   In regard to the second objection we say, if the court is satisfied from the evidence produced by the state that the declaration in question was made by the deceased in contemplation or apprehension of impending death, no controverting testimony on the part of the defendant will be heard before the statement is admitted. Such testimony may at a later stage of the trial be offered by the defense in reply to that produced by the state, and it will be a matter for subsequent determination from all the evidence whether the statement admitted in evidence is, or is not, in fact a dying declaration and what weight and effect, if any, shall

be given to it. When admitted the statement is presumed to be a dying declaration, it is such *prima facie*, and if not successfully controverted it is clothed with the peculiar sanctity and force which such evidence is entitled to. But the presumption may be rebutted by the evidence produced by the defendant, and when rebutted and shown not to be a dying declaration the statement should not be regarded by the jury at all. And if the statement which has been admitted is not actually and wholly rebutted by the evidence produced by the defendant, it may be weakened and impaired thereby, and such fact is to be duly considered by the jury in estimating its value and effect. This is, we think, the law of this state as declared in the case of *State v. Frazier* already referred to, in which the court said: "Whether in this case the declarations contained in the affidavits of the deceased, which have been read to you, were brought within the rule, was a question for the court, as like questions are in all other cases, and upon hearing the evidence on the part of the prosecution we permitted them to go in evidence. * * * But after hearing other evidence in reference to this matter on the part of the prisoner, we now deem it our duty to say to you that the force and weight of these declarations contained in the affidavits are very much weakened and impaired. * * * The remark [made by the deceased] tends to some extent to show that Eliason was not entirely without hope of recovery, and therefore we say that the weight of the declarations is considerably weakened. Yet we are not disposed to take this portion of the evidence entirely from you, but leave it with you to be weighed and considered by you with caution, and accredited so far as you may in your judgment believe it to be entitled under all the surrounding circumstances."

In that case Mr. Bayard, who was counsel for the defendant, asked before the statement was admitted in evidence that he might be allowed to call a witness from whose testimony it would appear that the deceased was not impressed with the apprehension of death, but was still hopeful of living when the declarations were made. The court, after consideration, refused the application and excluded the testimony on the ground of its irregularity and the long-established practice of the court to the contrary, citing

as an authority the case of State v. Cornish, 5 Harr. 502, which was regarded as a stronger case for the prisoner. It was held in that case to be the province and duty of the court to determine the preliminary question whether the declarations were made under an apprehension of impending death, on the prima facie proof presented on that point by the direct and cross-examination of the witnesses produced by the state, without hearing any witnesses on the other side to rebut or controvert it. And it was also held that when the declarations are admitted in evidence they rest on the same level with all the other evidence, and the credit, weight and effect of them are alone to be considered and determined by the jury; and they may after their admission in evidence be weakened and impaired, contradicted and disproved by the testimony for the prisoner subsequently produced.

[4] Under the third objection it is contended by the defendant, and not denied by the state, that no one who was present at the time the declaration in question was made, has given any testimony which shows, or tends to show, that the deceased had no hope of recovery at that time. There was testimony produced by the state from which it clearly appears that at other preceding times the deceased had no such hope because he believed he was "done for", was "going to die," could "not recover"; and the declarations made at such times were admitted without objection. There was a witness produced by the state who testified that he talked with the deceased a half or three-quarters of an hour before the statement in question was made, when the deceased said to the witness he was "done for", but the only testimony which indicated the state of the deceased's mind respecting his condition at the time the statement was made was that of the magistrate who testified that the deceased asked the surgeon if he thought he would recover, or get better, and that the surgeon evaded an answer, or, as the witness expressed it, "sidestepped the question."

We think such question asked by the deceased showed that he must, or might, at the particular time, have had some doubt about dying, and indicated some hope of recovery—however slight it may have been. It is more than possible that his opinion

concerning his condition and possibility of recovery may have undergone some change since making other declarations a day or two before, and even during the half or three-quarters of an hour that intervened between the last two statements. A question very similar to the one we are now considering was passed upon by the court in *State v. Buchanan*, 1 *Houst. Cr. Cas.* 79. In that case "it was proved that although he lingered and did not expire until several days afterwards, the deceased had from the first day expressed his belief that he must die of the wounds received but it was also proved that three or four days after he had been wounded he inquired of a friend on a visit to him what he thought of his condition, and who told him he must die, and that up to that time his attending physician, of whom a similar inquiry had in the meanwhile several times been made by him, had encouraged the hope of recovery on his part, but on being asked the question after that time by him, made no reply to it." Upon that state of facts Chief Justice Gilpin said: "The court had been and should always be cautious in admitting what were termed dying declarations in evidence, as such declarations were often made in critical danger of death, and in a state of apprehension and despondency, before all hope or expectation of ultimate recovery had been entirely abandoned by the person making them; but as far as the testimony had gone on this subject, the court did not feel satisfied on that point, and must therefore exclude the evidence offered."

The law is well settled, in this and many other states, that before a statement made by the deceased can be admitted as a dying declaration the court must be satisfied that it was made in apprehension of impending death, and when there was no hope or expectation of ultimate recovery. We do not think the statement before us was made under such conditions, according to the testimony in the case, and are therefore of the opinion that it should not be admitted in evidence.

There may be cases where the statement made by the deceased would be admissible as a dying declaration even though there is no testimony of expressions made by the deceased at the time showing that he had abandoned all hope of recovery. It may

sufficiently appear to the court from all the other facts and circumstances of the case that the deceased had no hope of recovery at all when the statement was made, but we do not think the present case is of such character. Indeed, we are of the opinion that the question which the deceased asked the surgeon at the time the declaration before us was made is sufficient to distinguish this case from any of those cited by the state.

In *State v. Trusty*, 1 *Penn.* 319, 40 *Atl.* 766, the court quoting from *Section* 158 of 1 *Greenleaf on Evidence* said:

"It is essential to the admissibility of these declarations, and is a preliminary fact to be proved by the party offering them in evidence, that they were made under a sense of impending death; but it is not necessary that they should be stated at the time to be so made. It is enough if it satisfactorily appears in any mode that it was made with that sanction, whether it be directly proved by the express language of the declarant, or be inferred from his evident danger, or the opinion of the medical or other attendants, stated to him or from his conduct, or other circumstances of the case, all of which are resorted to in order to ascertain the state of the declarant's mind. * * * It is, therefore, only necessary to show the circumstances which warrant us in believing that the deceased was under the apprehension of impending death."

Courts have always been very careful and cautious, and properly so, in admitting statements made by the deceased, as dying declarations, because they are not made in court or under its direction; and for the further reason that no opportunity for cross examination is afforded the defendant.

In *State v. Frazier* the court used the following language in discussing this point:

"Such declarations are generally made without the sanction and obligation of an oath, and without an opportunity to those against whom they are used to cross examine the party making them. Dying declarations of a deceased party are only admissible when made under a sense of impending dissolution, and some writers on the subject go so far as to say that such declarations, to be admissible, must be made under a sense of impending and almost immediate dissolution; others have somewhat relaxed the

rule, and are not quite so rigid in their construction of it. We think the proper and most sensible construction is that there must exist in the mind of the party making such declarations, at the time they are made, a firm conviction of impending dissolution, if not immediate, at no distant day, and that there should not be a lingering hope of ever recovering."

The objection to the admissibility of the testimony is sustained.

The state resting, evidence was introduced for the prisoner to prove previous threats by the deceased against him; the size and strength of the deceased; the injuries inflicted upon the prisoner by the deceased, consisting of severe bruises about the head and face and the dislocation of his shoulder (the opinion of one physician who examined the prisoner, shortly after the affray, being that the wound on the head was made by some hard substance other than the fist); also evidence tending to prove the general good reputation of the prisoner for peace and good order in the community in which he lived.

The Attorney General, thereupon, under all the facts disclosed, with the concurrence of the court, entered a *nolle prosequi;* and the accused was discharged.